Kern, Leila R., J.
Allan Routhier (Routhier) brings this action as the administrator of his late wife Diane Routhier’s estate against the defendant, Dr. Timothy Keenan, M.D., Diane’s physician. Routhier alleges that Keenan’s negligent treatment was the cause of Diane’s suicide. Before this court is Keenan’s motion in limine to exclude all evidence regarding any causal connection between the drug bupropion (marketed as Wellbutrin® or Zyban®) and suicide, or suicidal ide-ation, and the expert testimony of Routhier’s witnesses, Donald Marks, M.D. and Ronald Maris, Ph.D. as to any such connection.

BACKGROUND

On June 25, 2003, Diane, a forty-one-year-old white female, committed suicide in the basement of her family home shooting herself in the head with her husband’s handgun.
Routhier alleges that, beginning in early 2002, Diane suffered from gastrointestinal and abdominal pains, nausea, indigestion, migraines, backaches, and hot/cold spells. During June of 2003, Diane’s symptoms worsened, her urine turned dark, her skin paled and she began to lose weight. On June 18, 2003, a week before her death, Diane consulted with Keenan, telling him that she did not “feel good.” Keenan prescribed Wellbutrin, an antidepressant and smoking cessation medication of the aminoketone class, and gave Diane samples of the drug. Routhier also alleges that, during her final week, Diane ingested three tablets of Wellbutrin, her physical symptoms worsened, and she became uncharacteristically lethargic, subdued and withdrawn. Routhier contends that Diane was bedridden during her last three days, suffering from insomnia, nausea, headaches, toothaches, dizziness and diarrhea. An autopsy performed by the Massachusetts State Police found that Diane had gallstones, an undiagnosed condition that may have explained many of Diane’s alleged symptoms.
Routhier plans to introduce the opinions of two experts, Marks and Maris. In their expert reports and deposition testimony, both experts opine that ingestion of Wellbutrin can cause patients to commit suicide (general causation) and that Wellbutrin caused Diane to commit suicide (specific causation).
On September 25, 2008, after deposing Marks and Maris and reading their reports, Keenan filed a motion in limine to exclude all evidence regarding a causal connection between the use of Wellbutrin and suicide or suicidal ideation, and all testimony from Routhier’s experts. Keenan claims that Marks and Maris are unqualified to give expert opinions about Wellbutrin and suicide, and that their testimony and reports are both irrelevant and unreliable under the standards set forth in Commonwealth v. Lanigan, 419 Mass. 15 (1994). Alternatively, Keenan contends that, because research from the Food and Drug Administration has conclusively proven there is no causal link between the use of Wellbutrin or antidepressants and suicide in adults over twenty-four years of age, Routhier is preempted from presenting any evidence to the con-traiy. In support of his motion, Keenan has submitted Routhier’s answers to expert interrogatorries as well as the deposition testimony and expert reports of Marks and Maris.

DISCUSSION

I. The Daubert-Lanigan Standard
This court acts as gatekeeper in determining whether to allow expert testimony by conducting a preliminary assessment of the methodology underlying the expert opinions, and by determining whether the opinion can properly he applied to the facts of the case. Lanican, 419 Mass. at 26. The function of the trial judge is to eliminate unreliable testimony that would not be helpful to the trier of fact. Id. at 25: see also Peterson v. Board of Assessors of Boston, 62 Mass.App.Ct. 428, 433 (2004) (striking expert testimony for unreliable methodology is “designed to eliminate junk science’ ... as competent expert evidence”).
An expert may present opinions that “assist the trier of fact to understand the evidence or to determine a fact in issue.” Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588 (1993). A witness is qualified to render an expert opinion by virtue of his or her specialized experience, training or education relevant to the subject of the proposed testimony. Commonwealth v. Richardson, 423 Mass. 180, 183 (1996). The party offering expert opinion on a scientific matter must show that the expert has “a reliable basis in the knowledge and experience of his discipline.” Lanican, 419 Mass. at 25.
Under Daubert-Lanigan, a party seeking to introduce scientific evidence must lay an adequate foundation either by establishing its general acceptance in the scientific community or by showing that the evidence is reliable and valid through an alternative means. Lanigan, 419 Mass. at 25-26. In Lanigan, the Supreme Judicial Court adopted the non-exhaustive list of four factors identified in Daubert that a court *51 may consider in determine the reliability of scientific opinion. Id. These factors ask whether the proposed theory has: (1) been subjected to peer review and publication; (2) been tested; (3) a known error rate; and (4) achieved general acceptance in the relevant scientific community. Id. General acceptance in the relevant scientific community is its own sufficient basis of reliability. See Commonwealth v. Patterson, 445 Mass. 636, 640-41 (2005). Opinions based on the clinical or personal observations of an experienced professional may also be admissible. See Canavan's Case, 432 Mass. 304, 313 (2000); see also Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 12-13 (1998). The proponent of expert opinion testimony bears the burden of proving its admissibility. Canavan’s Case, 432 Mass. at 310.

I. Marks’s Qualifications and Expert Opinions on Specific and General Causation

A.Marks’s Qualification to Offer his Expert Opinion on Issues of Causation

Keenan contends that Marks is unqualified to offer an expert opinion on any perceived connection between Wellbutrin and suicide because Marks specializes in internal medicine, rather than suicidology, pharmacology, psychiatry or any other more relevant discipline. An expert, however, may be qualified to testify on a subject other than the area of his greatest expertise. Richardson, 423 Mass, at 183.
Although it is true that Marks currently practices internal medicine and is the director of the hepatitis clinic at Cooper Green Hospital in Birmingham, Alabama, he is otherwise qualified to offer his expert opinion on specific and general causation. Marks holds a Ph.D. in microbiology, has extensive experience in pharmaceutical medicine, and has worked as a clinical researcher developing medications and as a medical safety officer in the pharmaceutical industry. He is a diplómate of the American Board of Internal Medicine, a fellow of the American College of Physicians, and a member of both the American Academy of Pharmaceutical Physicians and the Regulatory Affairs Professionals Society. Marks therefore possesses sufficient education, training, experience, and familiarity with adverse reactions to pharmaceuticals to offer an expert opinion on whether Wellbutrin can cause suicide and whether it caused Diane’s suicide.
B.Marks’s Opinion on General Causation Is Unreliable under Daubert-Lanigan
Marks’s expert opinion that Wellbutrin can cause suicide is unreliable and cannot be admitted under Daubert-Lanigan. Marks’s expert report and deposition testimony shed little light on his methodology. In his expert report, Marks lists, in general terms, the sources[1] he evaluated and cites his professional experience[2] as a clinical researcher and medical safety officer in the pharmaceutical industry. He fails, however, to identify specific studies or articles he reviewed, the conclusions he may have drawn from them or the extent and relevance of professional experience. Thus, it is unclear what weight Marks granted to the various sources of information he considered, whether he relied upon sound science,[3] and what was the basis for his personal or clinical observations. Marks does not indicate whether his theory of general causation has been: (1) subjected to peer review and publication; (2) tested; (3) established to have a known error rate; or, (4) generally accepted by the relevant scientific community. Lanigan, 419 Mass. at 26. Marks’s flawed methodology and his unwarranted reliance on inconclusive evidence renders his expert opinion unreliable and therefore inadmissible under Daubert-Lanigan.

C.Marks’s Opinion on Specific Causation Is Unreliable under Daubert-Lanigan

Marks’s expert opinion on specific causation is inadmissible because it is derivative of and entirely dependant on, his inadmissible general causation opinion. Marks testified at his deposition that he began his differential diagnosis to determine the cause of Diane’s suicide by considering what he believed to be the three most plausible causes of Diane’s suicide, (1) a major depressive disorder; (2) transient psychosis; or, (3) drug-induced suicidal ideation that led to suicide. Marks testified that, because he found no evidence that Diane had suffered from a major depressive disorder or experienced a transient psychosis, her suicide was likely caused by an adverse reaction to the approximately three 100 mg tablets of Wellbutrin she may have ingested in the week prior to her suicide. However, because he does not provide adequate support for “ruling in” Wellbutrin as a plausible cause of Diane’s suicide, his report and testimony are fatally flawed under Daubert-Lanigan.[4]

II. Maris’s Qualifications and Expert Opinions on Specific and General Causation

A. Maris’s Qualifications to Offer His Expert Opinion on the Issues of Causation

Keenan argues that Maris is unqualified to give his expert opinion on general causation because: (1) his Ph.D is in social psychology rather than a relevant scientific or medical discipline; and, (2) he is not an expert on Wellbutrin because his prior research, teaching and publications do not concern the drug. This court finds Maris’s “education training, experience and familiarity with the subject matter of the testimony” sufficient to qualify him to testify as to the issues of general and specific causation. Richardson, 423 Mass. at 183. In addition to his Ph.D. in social psychology, Maris is a well-recognized expert in the field of suicidology. Maris became a certified suicidol-ogist following five years of post-doctoral study at the Johns Hopkins University Medical School. Since 1962, he has reviewed thousands of suicide case studies and conducted extensive epidemiological research on suicide and its causes. He is currently a distinguished professor emeritus and adjunct professor of psychiatiy and family medicine at the University *52 of South Carolina School of Medicine. He has published several books on the subject of suicide and his work has appeared in numerous peer-reviewed publications. Although Maris’s experience with Wellbutrin may be limited, the record demonstrates his substantial familiarity with antidepressants as a class and his knowledge of the relevant scientific and medical literature. Based on his knowledge, skill, experience, training, and education, Maris is qualified to give his expert opinion as to whether Wellbutrin can cause suicide and whether it was the cause of Diane’s suicide. See Richardson, 423 Mass. at 183.
B. Maris’s Opinion on General Causation Is Reliable under Daubert-Lanigan
Keenan argues that studies conducted by the FDA[5] and those conducted by others using FDA reported data[6] have conclusively demonstrated that antidepressants, including Wellbutrin, are not causally linked to suicide. Keenan also points out that, at his deposition, Maris failed to identify a randomized clinical trial or epidemiological study that has established a causal relationship between Wellbutrin and adult suicide, or any regulatory or scientific organization that has concluded such a link exists. Accordingly, Keenan contends that Maris’s contrary opinion is mere inadmissible conjecture because no scientific methodology can establish its reliability. This court disagrees.
The record shows that suicide is a rare phenomenon with many causes, and that its study is fraught with ethical and practical difficulties. Maris’s methodology addresses many of the inherent complexities of suicidology and incorporates a broad spectrum of scientific learning on the subject. Maris’s expert opinion that Wellbutrin can cause suicide, although not generally accepted by the scientific community, is otherwise reliable as shown by the record and must be admitted under Daubert-Lanigan. Lanigan, 419 Mass. at 25-26. In his expert report, Maris references numerous studies that have been subjected to peer review and publication. Lanigan, 419 Mass. at 26. Although these studies lack known error rates, Maris effectively defends their methodologies. Id. Finally, Maris’s expert opinion and his interpretation of the available data are supported by his clinical experience studying and treating suicide patients and his knowledge of suicide epidemiology.
Maris evaluated the studies referred to by Keenan, as well as studies conducted during the development and approval phases of antidepressant drugs. His methodology, however, grants greater weight to small studies specifically designed to assess the potential for .antidepressant-induced suicide ideation or suicide. Maris opines that the structure of RCTs and the manner in which they are conducted make them ill-suited to the study of drug-induced suicide. He notes that no RCTs have been specifically conducted to test the hypothesis that Wellbutrin or any other antidepressant can cause suicide. Additionally, experimental and ethical considerations cause existing studies to under estimate the potential suicide risk posed by these drugs. For example, subjects identified in pretrial screenings as “seriously suicidal,” or as having previously attempted suicide, have been excluded from such studies, presumably because placing such individuals on a placebo would be unethical. Maris acknowledges that no RCT has established that Wellbutrin can cause suicidal ideation or suicide. He points out, however, that fewer RCTs have been conducted for Wellbutrin than for nearly any other antidepressant. Additionally, because suicide rates are very low in the general population (approximately one in ten thousand per year), the Wellbutrin trials may have been simply too small to reveal any suicides. Based on these facts, Maris concludes that RCTs are of limited value for studying possible causal links between antidepressant use and suicide.
In his expert report, Maris cites several studies that have linked antidepressants to significant increases in the relative risk rates for suicide.[7] These studies were published in highly respected peer-reviewed journals including: The British Journal of Psychiatry; The British Medical Journal; The American Journal of Psychiatry; The Journal of Clinical Psychiatry; and The Archives of General Psychiatry. Although some of these studies did not use RCT or epidemiological methods, Maris cites support for their methodologies within the scientific community.[8]
The record shows that a link between the use of antidepressants such as Wellbutrin and suicide has not been conclusively proven nor disproven. As such, the FDA studies cited by Keenan do not serve to bar Maris’s expert testimony as to general causation. Maris has presented a reasoned defense of his methodology and critique of the RCT and epidemiological studies cited by Keenan. Although Maris’s own methodology, assumptions and conclusions are also subject to criticism, these concerns relate to the weight granted to his opinions not their admissibility. Therefore, Maris’ expert report and testimony as to the issue of general causation is reliable under Daubert-Lanigan and must be admitted. See Lanigan 419 Mass, at 26.
C. Reliability of Maris’s Opinion on Specific Causation under Daubert-Lanigan
Maris bases his opinion that Diane’s suicide was caused by Wellbutrin on the results of a “psychological autopsy” he conducted in an attempt to reconstruct her psychological life, thoughts, feelings and relevant environmental factors in the weeks preceding her death. A number of courts have held that a psychological autopsy is a generally accepted methodology for determining the cause of a suicide. Blanchard v. Eli Lilly & Co., 207 F.Sup.2d 308, 313 n.2 (D.Vt. 2002); Cloud v. Pfizer, Inc., 198 F.Sup.2d 1118, 1135 (D.Ariz. 2001); Herrin v. Treon, 459 F.Sup.2d 525, 545 (N.D.Tex. 2006); Yanco v. United States, 45 Fed. Cl. 782, 787 (Fed. Cl. 2000). Maris reviewed the deposi *53 tions of Diane’s friends, family and Keenan, the Massachusetts State Police incident reports, Diane’s autopsy, toxicological laboratory reports, literature on Wellbutrin and its side effects, Marks’s expert report and photos of Diane’s death scene and autopsy. Maris also analyzed fifteen suicide risk factors and ten protective factors his research has identified as statistically significant. Maris noted that Dianne only had one risk factor (presence of guns in the household), nine out of ten protective factors, and no history of suicide in her family.[9] Maris also found that Diane had ingested three Wellbutrin tablets, and that she experienced side effects consistent with Wellbutrin use, including: nausea, insomnia, irritability, anxiety, akathisia and CNS stimulation. Maris’s expert opinion on the issue of specific causation is the product of a sound methodology and a thorough analysis of the available relevant information. Therefore, Maris’s expert opinion is reliable and must be admitted under Daubert-Lanigan. Lanigan, 419 Mass. at 26.

ORDER

For the foregoing reasons, the defendant’s Motion in Limine to Exclude Testimony by or on Behalf of the Plaintiff of a Causal Connection between Bupropion and Adult Suicide is DENIED in part and ALLOWED in part. As to the testimony and expert report of Donald Marks, M.D., the motion is ALLOWED, as to the testimony and expert report of Ronald Maris, Ph.D., the motion is DENIED.

 Marks states in his expert report that his general causation opinion was based on his review of the warnings contained in the FDA-mandated prescrtbing information for Wellbutrin, clinical studies of Wellbutrin, articles from the medical literature on the adverse events “occurring as a result of Wellbutrin and other serotonin active drugs,” and “hundreds of clinical cases of potential medication adverse events.”

 Routhier argues that, in the absence of epidemiological studies general causation may be established by personal observations, clinical experience, studies or case reports. Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 12-13 (1998). Marks’s clinical experience with antidepressant-related adverse drug events and suicidality, however, is not analogous to the extensive clinical experience and expertise of the doctors who testified in Vassallo.

 Marks relies on the FDA’s prescribing information warnings as definitive evidence of causation. His reliance is misplaced. The content of Wellbutrin’s prescribing information warnings are determined by the FDA without regard for whether causation has been established. C.F.R. §201.57(c)(6)(I)(2006) (requiring prescription drug labeling to “include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug: a causal relationship need not have been definitively established”).

 In his report, Marks advances an alternate theory that Diane experienced many of the adverse drug effects warned of in Wellbutrin’s prescriptions information, including: restlessness, agitation, anxiety, delusions, hallucinations, psychotic episodes, confusion, and paranoia, and that these “adverse medication effects led to suicidal ideation and eventual suicide.” However, Marks sites no authority for the propositions that these effects can cause patient suicides, or that the warnings included in the prescribing information are grounded in sound science.

 In 2006, the FDA analyzed data from 372 randomized clinical trials involving nearly 100,000 individuals and found some evidence of a link between antidepressants and suicide in younger patients, but no statistically significant risk for patients in Diane’s 25-64 age cohort.

 Arif Khan, M.D., Shirin Khan, Russell Kolts, Ph.D & Walter A. Brown, M.D., Suicide Rates in Clinical Trials of SSRIs, Other Antidepressants, and Placebo: Analysis of FDA Reports, 160 Am. J. Psychiarty, 790-92 (Apr. 2003.)

 S. Donavan et al., Deliberate Self-harm and Anti-depressant Dmgs, 177 Brit. J. of Psychiatry 551-56 (2000); S.S Jick et al., Antidepressants and Suicide, 310 Brit. Med. J. 215-18; M. Fava & J. Rosenbaum, Suicide and Fluoxetine, J. of Clinical Psychiatry, 52-53 (1991); Arif Khan, M.D., Shirin Khan, Russell Kolts, Ph.D. & Walter A. Brown, M.D., Suicide Rates in Clinical Trials of SSRIs, Other Antidepressants, and Placebo: Analysis of FDA Reports, 160 Am. J. Psychiatry, 790-92 (Apr. 2003).

 Maris quotes from the “Beasley protocol,” developed by Eli Lilly and Charles M. Beasely, M.D. in 1991, following a study of the relative value of RCTs, epidemiological studies, and protocols for testing suicidal ideation in subjects taking fluoxetine (Prozac): “[a] rechallenge study, although still with its own limitations, is considered the best of the three options (viz., of epidemiology, RCT & CDR) with respect to minimizing disadvantages and maximizing positive aspects.”

 Maris concluded that Diane had no history of a major depressive disorder or alcohol abuse, the two most important risk factors.